# IN THE SUPREME COURT OF CALIFORNIA

LEGISLATURE OF THE STATE OF CALIFORNIA et al.,
Petitioners,

v.

SHIRLEY N. WEBER, as Secretary of State, etc.,
Respondent;

THOMAS W. HILTACHK,
Real Party in Interest.

S281977

---

June 20, 2024

Justice Liu authored the opinion of Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

---

LEGISLATURE OF THE STATE OF CALIFORNIA v. WEBER

S281977


Opinion of the Court by Liu, J.


Petitioners — the Legislature of the State of California, Governor Gavin Newsom, and elector and former Senate President Pro Tempore John Burton — filed this original proceeding seeking a writ of mandate or prohibition to bar the Secretary of State (Secretary) from placing an initiative measure on the November 2024 general election ballot. The measure at issue has been designated Attorney General Initiative No. 21-0042A1 and Secretary of State Initiative No. 1935, and has been named the "Taxpayer Protection and Government Accountability Act" by its drafters. We refer to it as the "TPA." The petition primarily contends that the TPA is invalid because it attempts to revise the California Constitution via citizen initiative. Petitioners also argue that the TPA is invalid because it would seriously impair essential government functions. Petitioners named Thomas W. Hiltachk, the proponent of the challenged measure (Proponent), as real party in interest.

We issued an order to show cause and established an expedited briefing schedule in order to resolve this matter before the date that the Secretary must formally qualify the initiative for the ballot and prepare related materials for the voter information guide.

"We stress initially the limited nature of our inquiry. We do not consider or weigh the economic or social wisdom or

general propriety of the initiative." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 (*Amador Valley*).)  The only question before us is whether the measure may be validly enacted by initiative.  After considering the pleadings and briefs filed by the parties and amici curiae as well as the parties' oral arguments, we conclude that Petitioners have clearly established that the challenged measure would revise the Constitution without complying with the appropriate procedure.  The changes proposed by the TPA are within the electorate's prerogative to enact, but because those changes would substantially alter our basic plan of government, the proposal cannot be enacted by initiative.  It is instead governed by the procedures for revising our Constitution.  We therefore issue a peremptory writ of mandate directing the Secretary to refrain from taking any steps to place the TPA on the November 5, 2024 election ballot or to include the measure in the voter information guide.

## I.

We begin by summarizing the terms of the TPA and then recount the procedural history of this matter.

## A.

The complete text of the initiative is set forth in the appendix.  In the original, proposed deletions to constitutional text are denoted in ~~strikeout~~ and proposed additions are denoted by *italics and underscoring*.  When quoting the text here, we have omitted italics and underscoring, except where necessary to identify the proposed modifications.

Section 1 provides that the initiative shall be known as the "Taxpayer Protection and Government Accountability Act."

Section 2 sets forth several "Findings and Declarations." Subdivision (a) declares that "Californians are overtaxed"; cites U.S. Census Bureau data concerning the state's combined state and local tax burden, which the initiative declares to be "the highest in the nation"; and notes that legislation proposed in 2021 continued to raise taxes and fees despite recent revenue surpluses. Subdivision (b) declares that the state's tax burden is "only part of the reason for California's rising cost-of-living crisis" and refers to "hidden 'fees' passed through to consumers in the price they pay for products, services, food, fuel, utilities and housing." Subdivision (c) declares that the state's high cost of living "not only contributes to the state's skyrocketing rates of poverty and homelessness," but also "push[es] working families and job-providing businesses out of the state." Subdivision (d) recounts prior voter attempts "to assert control over whether and how taxes and fees are raised," including Proposition 13 in 1978, Proposition 62 in 1986, Proposition 218 in 1996, and Proposition 26 in 2010. Subdivision (e) declares: "Contrary to the voters' intent, these measures that were designed to control taxes, spending and accountability, have been weakened and hamstrung by the Legislature, government lawyers, and the courts, making it necessary to pass yet another initiative to close loopholes and reverse hostile court decisions."

Section 3 says the initiative's purpose is to enable voters to "reassert their right to a voice and a vote on new and higher taxes by requiring any new or higher tax be put before voters for approval." (TPA, § 3, subd. (a).) Section 3 goes on to state additional purposes of the initiative: "to increase transparency and accountability . . . by requiring any tax measure placed on the ballot — either at the state or local level — to clearly state the type and rate of any tax, how long it will be in effect, and the

use of the revenue generated by the tax" (*id.*, subd. (b)); to ensure that any new or increased form of state government revenue is "broadly supported and transparently debated" by requiring that any exaction "be authorized only by a vote of the Legislature and signature of the Governor" (*id.*, subd. (c)); and "to ensure that taxpayers have the right and ability to effectively balance new or increased taxes and other charges with the rapidly increasing" cost of living and to "protect the existing constitutional limit on property taxes and ensure that the revenue from such taxes remains local" (*id.*, subd. (d)). The final purpose of the initiative, set forth in subdivision (e), is "to reverse loopholes in the legislative two-thirds vote and voter approval requirements for government revenue increases created by the courts including, but not limited to," *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924 (*Cannabis Coalition*), *California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, *Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, and *Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105 (*Wilde*).

Section 4 is the first substantive provision of the initiative. It would amend article XIII A, section 3 of the California Constitution, first, by adding a new subdivision (a) to provide that "[e]very levy, charge, or exaction of any kind imposed by state law is either a tax or an exempt charge." (TPA, § 4.) The term " 'tax' " is currently defined as "any levy, charge, or exaction of any kind imposed by the State," with enumerated exceptions. (Cal. Const., art. XIII A, § 3, subd. (b); all undesignated articles hereafter refer to provisions of the

California Constitution.)  The TPA would amend this definition to provide that, as used in article XIII A and in section 9 of article II, " 'tax' means *every* ~~any~~ levy, charge, or exaction of any kind imposed by ~~the State~~ *state law that is not an exempt charge*," and current exceptions to the definition of "tax" would be amended and incorporated into a new definition of "exempt charge."  (TPA, § 4 [proposed art. XIII A, § 3, subds. (d), (e)].)  Section 9 of article II recognizes the electorate's referendum power to approve or reject statutes "except . . . statutes providing for tax levies or appropriations for usual current expenses of the State."  (Art. II, § 9, subd. (a).)  Thus, under the TPA, every state exempt charge would be subject to referendum because it does not qualify as a "tax."  The term "state law" would be defined in this context to include, but not be limited to, "any state statute, state regulation, state executive order, state resolution, state ruling, state opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by the legislative or executive branches of state government," while excluding actions taken by The Regents of the University of California, the Trustees of the California State University, or the Board of Governors of the California Community Colleges.  (TPA, § 4 [proposed art. XIII A, § 3, subd. (h)(4)].)

Second, section 4 imposes what Proponent refers to as the "State Tax Provision," renumbering what is now article XIII A, section 3, subdivision (a) as new subdivision (b)(1) and amending that provision as follows:  "Any change in state ~~statute~~ *law* which results in any taxpayer paying a *new or* higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, *and submitted to the electorate and approved by*

*a majority vote,* except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property, may be imposed." (TPA, § 4 [proposed art. XIII A, § 3, subd. (b)(1)].) New subdivision (b)(1) would also specify the contents of any such act for voter approval, including, among other things, the duration of the time the tax would be imposed and an estimate of the annual amount of revenue derived (TPA, § 4 [proposed art. XIII A, § 3, subd. (b)(1)(A)]) and "[a] specific and legally binding and enforceable limitation on how the revenue from the tax can be spent" (*ibid.* [proposed art. XIII A, § 3, subd. (b)(1)(B)]). Any such limitation could be changed only through a new legislative act passed by not less than two-thirds of all members of each house and submitted to the voters for approval by a majority vote. (*Ibid.*) Tax revenue "can be spent for 'unrestricted general revenue purposes,' " but only if set forth as such in a statement contained in a separate, stand-alone section. (*Ibid.*) Proposed subdivision (b)(2) would set forth additional requirements for ballot materials to accompany any initiative that would impose a tax, including any measure proposed by an elector.

Third, section 4 of the TPA would enact what Proponent refers to as the "State Exempt Charge Provision." This provision would add a new subdivision (c) to article XIII A, section 3, providing that "[a]ny change in state law which results in any taxpayer paying a new or higher exempt charge must be imposed by an act passed by each of the two houses of the Legislature." (TPA, § 4 [proposed art. XIII A, § 3, subd. (c)].) The TPA would put the burden on the state to prove "by ~~a preponderance of the~~ *clear and convincing* evidence" that a levy, charge, or other exaction is an exempt charge rather than a tax by showing that "the amount of the exempt charge is reasonable

and that the amount charged does not exceed the actual cost of providing the service or product to the payor," with "actual cost" defined as set forth in the initiative. (*Ibid.* [proposed art. XIII A, § 3, subds. (g)(1), (h)(1)].)

Fourth, section 4 of the initiative amends what is currently subdivision (c) of article XIII A, section 3 to provide the first of two rollback provisions, stating that "[a]ny tax or exempt charge adopted after January 1, 2022 . . . , but prior to the effective date of this act, that was not adopted in compliance with the requirements of this section is void 12 months after the effective date of this act unless the tax or exempt charge is reenacted . . . in compliance with the requirements of this section." (TPA, § 4 [proposed art. XIII A, § 3, subd. (f)].)

Section 5 of the initiative would amend article XIII C, section 1 of the California Constitution, which defines terms relevant to voter approval for local tax levies, in much the same manner as state tax levies. (TPA, § 5 [proposed art. XIII C, § 1, subds. (f) defining "local law," (i) defining "tax," (j) defining "exempt charge"].) Among other changes, section 5 would subject all local fines and fees that qualify as exempt charges, including license fees and rental fees, to voter referendum. (*Ibid.* [proposed art. XIII C, § 1, subds. (i) redefining "tax" for the purposes of Cal. Const., art. II, § 9, which governs referenda, (j) defining " ' exempt charge' "].)

Section 6 of the initiative would enact what Proponent refers to as the "Local Tax Provision" by amending article XIII C, section 2 of the California Constitution in several aspects. First, it would extend the current two-thirds voter approval requirement for local special taxes to apply not only when the tax is proposed by a local governing body but also when

proposed "by an elector." (TPA, § 6 [proposed art. XIII C, § 2, subd. (c)].) Second, it would require that any exempt charge be imposed by "the governing body of a local government" or via initiative, and it would prohibit local governments from imposing a tax or exempt charge by way of charter amendment. (*Ibid.* [proposed art. XIII C, § 2, subds. (e), (f)].) Third, it would enact the second rollback provision of the initiative, providing that "[a]ny tax or exempt charge adopted after January 1, 2022, but prior to the effective date of this act, that was not adopted in compliance with the requirements of this section is void 12 months after the effective date of this act unless the tax or exempt charge is reenacted in compliance with the requirements of this section." (*Ibid.* [proposed art. XIII C, § 2, subd. (g)].)

Section 7 of the TPA proposes to amend section 3 of article XIII D, which limits property taxes, assessments, fees, and charges. It would add surcharges, including those "based on the value of property," to the list of levies that state and local governments are barred from assessing "upon any parcel of property" or property ownership. (TPA, § 7 [proposed art. XIII D, § 3, subd. (a)].) Section 7 would also revise two of the enumerated exceptions to this bar. First, article XIII D, subdivision (a)(1), which currently exempts ad valorem property taxes "imposed pursuant to article XIII and article XIII A," would be modified to exempt ad valorem property taxes that are "*described in Section 1(a) of* Article XIII and *Section 1(a) of Article XIII A*" (TPA, § 7) as well as those "*described and enacted pursuant to the voter approval requirement in Section 1(b) of* Article XIII A" (*ibid.*). Second, article XIII D, subdivision (a)(2), which now exempts "[a]ny special tax receiving a two-thirds vote pursuant to section 4 of article XIII A" (i.e., those imposed by cities, counties, and special districts), would be modified to

exempt "[a]ny special *non-ad valorem* tax receiving a two-thirds vote *of qualified electors* pursuant to section 4 of article XIII A" (TPA, § 7 [proposed art. XIII D, § 3, subd. (a)(2)]) or "*a two-thirds vote of those authorized to vote in a community facilities district by the Legislature pursuant to statute*" (*ibid.*).

Section 8 of the initiative proposes to amend sections 1 and 14 of article XIII. It would add a new provision to section 1, subdivision (c) that would require "[a]ll proceeds from the taxation of property" to be apportioned "to the districts within the counties." (TPA, § 8 [proposed art. XIII, § 1, subd. (c)].) Section 14 of article XIII would be amended to clarify that "[n]otwithstanding any other provision of law," state and local property taxes must also be apportioned "to the districts within the counties." (TPA, § 8 [proposed art. XIII, § 14].)

Section 9 contains several general provisions, including a severability clause (TPA, § 9, subd. C).

**B.**

On January 4, 2022, Proponent submitted the initiative measure to the Attorney General for preparation of a circulating title and summary, which are required before an initiative may be circulated for signature. (Art. II, § 10, subd. (d); Elec. Code, § 9002.) On February 1, 2023, the Secretary certified that the initiative petition had received the required number of signatures to qualify for the November 2024 general election ballot.

On September 26, 2023, Petitioners filed an emergency petition for writ of mandate, asserting that the proposed initiative is an impermissible attempt to revise rather than amend the California Constitution. Secondarily, Petitioners argued that the proposed initiative is invalid because it would

impair essential government functions. Petitioners further claimed that preelection review was necessary for various reasons explained below. Several amici curiae filed briefs in support of the petition.

The petition named the Secretary as respondent and Proponent as real party in interest. After requesting and reviewing preliminary responses from the Secretary and Proponent, and after receiving amicus curiae briefs opposing the petition, we issued an order to show cause and set the case for expedited briefing and decision.

The Secretary filed a return to the petition in order to apprise the court of relevant election deadlines for the November 5, 2024 General Election as they relate to this proceeding. Specifically, she requests that this matter be resolved by June 27, 2024, the date she must formally qualify the TPA for the November 5, 2024 General Election ballot. The Secretary also provides some factual background on the potential effects of the initiative on election administration, as well as the processes and costs of conducting special elections. She takes no substantive position on the issues presented.

## II.

We typically review constitutional challenges to an initiative after an election in order to avoid disrupting the electoral process and the exercise of the franchise. (*Brosnahan v. Eu* (1982) 31 Cal.3d 1, 4.) But preelection review is proper for challenges that go "to the power of the electorate to adopt the proposal in the first instance." (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 667.) Preelection review is available where, as here, "the challenge is based upon a claim . . . that the proposed measure may not properly be submitted to the voters

because the measure is not legislative in character or because it amounts to a constitutional revision rather [than] an amendment." (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1153 (*Jones*); see *McFadden v. Jordan* (1948) 32 Cal.2d 330, 331–332 (*McFadden*) [granting preelection relief upon holding that proposed initiative sought to revise, not amend, the Constitution].)

Most recently, we exercised preelection review in *Jones* to consider a challenge by the Senate and others to a proposed initiative that sought to restrict state officers' pay and to transfer the power to reapportion state legislative districts from the Legislature to this court. (*Jones*, *supra*, 21 Cal.4th at pp. 1146–1149.) Petitioners claimed the measure was invalid because it amounted to a constitutional revision rather than an amendment, because the measure violated the single-subject rule of the California Constitution, and because the petitions circulated to qualify the measure for the ballot contained misleading statements and omissions. (*Jones*, at p. 1150.) We found preelection review to be appropriate because "[u]nder such circumstances, deferring a decision until after the election not only will defeat the constitutionally contemplated procedure . . . , but may contribute to an increasing cynicism on the part of the electorate with respect to the efficacy of the initiative process." (*Id.* at p. 1154.) " 'The presence of an invalid measure on the ballot steals attention, time, and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.' " (*Ibid.*, quoting *American Federation*

*of Labor v. Eu* (1984) 36 Cal.3d 687, 697 (*American Federation of Labor*).)

As relevant here, article XVIII of the California Constitution provides that the electorate "may amend the Constitution by initiative" (art. XVIII, § 3) but that an effort "to revise the Constitution" must proceed by way of a constitutional convention and popular ratification (*id.*, § 2) or by submission to the voters from a supermajority of the Legislature (*id.*, §§ 1, 3). (See *Amador Valley*, *supra*, 22 Cal.3d at p. 221.) After reviewing the petition and the opposition filed by Proponent, we determined that Petitioners had made a prima facie showing that the TPA would amount to an invalid constitutional revision based on its far-reaching changes to existing processes by which revenue measures are enacted and maintained at the state and local levels.

In the present matter, postelection review would be more challenging than in a typical case because of the TPA's rollback provisions. Those provisions would void any state or local "tax or exempt charge" adopted after January 1, 2022 and prior to the TPA's effective date if it was "not adopted in compliance with" the newly proposed requirements, unless it is reenacted with voter approval within one year of the TPA's effective date. (TPA, § 4 [proposed art. XIII A, § 3, subd. (f)]; *id.*, § 6 [proposed art. XIII C, § 2, subd. (g)].) The TPA, if enacted, would thus require the state and localities to start preparing to administer special elections if they wish to avoid nullification of taxes or charges imposed after January 1, 2022. These provisions would effectively transform any postelection review of the TPA into another form of preelection review in advance of the special elections expected to take place the following year. The rollback

provisions also generate uncertainty before the election as to whether already enacted revenue measures will be later voided.

For these reasons, we find that preelection review is appropriate in this matter.

## III.

Petitioners' primary claim is that the TPA would work an impermissible revision of the California Constitution. Where a preelection challenge asserts that a proposed initiative would effect an unlawful revision, "[o]ur prior decisions have made it clear that to find such a revision, it must *necessarily or inevitably appear from the face* of the challenged provision that the measure will substantially alter the basic governmental framework set forth in our Constitution." (*Legislature v. Eu* (1991) 54 Cal.3d 492, 510.) "Particularly when a preelection challenge is brought against an initiative measure that has been signed by the requisite number of voters to qualify it for the ballot, the important state interest in protecting the fundamental right of the people to propose statutory or constitutional changes through the initiative process requires that a court exercise considerable caution before intervening to remove or withhold the measure from an imminent election. Only when a court is confident that the challenge is meritorious and justifies withholding the measure from the ballot, should a court take the dramatic step of ordering the removal of a measure that ostensibly has obtained a sufficient number of qualified signatures." (*Costa v. Superior Court* (2006) 37 Cal.4th 986, 1007–1008.)

We begin with the relevant provisions of the California Constitution governing amendment and revision, and a review

of our case law on the distinction between the two. With those concepts in mind, we then analyze the TPA.

## A.

Article II of the California Constitution, which pertains to voting and the initiative, referendum, and recall powers, begins with the following principle: "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." (Art. II, § 1.) As relevant here, article II sets out the basic framework for voter initiatives, defining "initiative" as "the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them" (*id.*, § 8, subd. (a)) and setting forth procedural and substantive requirements for voter initiatives (*id.*, subds. (b)–(f)).

Whereas article II reserves to the people the power to *amend* the Constitution via citizen initiative, article XVIII sets forth the applicable procedures to either amend *or revise* the Constitution. Article XVIII is comprised of four sections:

"SEC. 1. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may propose an amendment or revision of the Constitution and in the same manner may amend or withdraw its proposal. Each amendment shall be so prepared and submitted that it can be voted on separately.

"SEC. 2. The Legislature by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, may submit at a general election the question whether to call a convention to revise the Constitution. If the majority vote yes on that question, within 6 months the Legislature shall provide

for the convention. Delegates to a constitutional convention shall be voters elected from districts as nearly equal in population as may be practicable.

"SEC. 3. The electors may amend the Constitution by initiative.

"SEC. 4. A proposed amendment or revision shall be submitted to the electors and, if approved by a majority of votes cast thereon, takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date. If provisions of two or more measures approved at the same election conflict, the provisions of the measure receiving the highest number of affirmative votes shall prevail."

In *Strauss v. Horton* (2009) 46 Cal.4th 364, 414 (*Strauss*), we summarized the import of these provisions as follows: "[U]nder these constitutional provisions an *amendment* to the California Constitution may be proposed to the electorate either by the required vote of the Legislature or by an initiative petition signed by the requisite number of voters. A *revision* to the California Constitution may be proposed either by the required vote of the Legislature or by a constitutional convention (proposed by the Legislature and approved by the voters). Either a proposed amendment or a proposed revision of the Constitution must be submitted to the voters, and becomes effective if approved by a majority of votes cast thereon at the election. Under these provisions, although the initiative power may be used *to amend* the California Constitution, it may not be used *to revise* the Constitution." (*Ibid.*, abrogated on another ground in *Obergefell v. Hodges* (2015) 576 U.S. 644, 685.)

In elucidating the distinction between an amendment and a revision, *Strauss* "examine[d] the origin and history of this distinction in our state Constitution as well as the numerous California decisions that have analyzed and applied the distinction over the course of many years." (*Strauss*, *supra*, 46 Cal.4th at p. 414; see *id.* at pp. 414–440.) From that lengthy discussion, we distill a few points here. As an initial matter, the distinction between amendment and revision dates back to the original 1849 Constitution, under which "[a]ny amendment or amendments" to the Constitution could be proposed by the Legislature upon a majority vote of both houses and thereafter submitted directly to the people. (Cal. Const. of 1849, art. X, § 1.) By contrast, if the Legislature, by a two-thirds vote of both houses, "th[ought] it necessary to revise or change this entire constitution," it could recommend to the voters that they convene a constitutional convention. (Cal. Const. of 1849, art. X, § 2.) These provisions show "that the amendment/revision distinction long predates the appearance of the initiative process in California." (*Strauss*, at p. 416.)

The provisions for revision and amendment were retained with modifications in the 1879 Constitution and placed in article XVIII. Among other changes, the 1879 Constitution increased the required legislative support for constitutional amendment from a majority of both houses to a two-thirds vote in both houses, which is the same threshold for presenting voters the question of whether to call a constitutional convention. What is significant for our purposes is that "under the 1879 Constitution as originally adopted, as under the 1849 Constitution, a *revision* of the constitution could be proposed only *by a constitutional convention* and contemplated a potentially broad reworking of the constitutional structure and

provisions, whereas '*any amendment or amendments*' to the Constitution could be proposed, and submitted directly to a vote of the people, *by the Legislature*." (*Strauss, supra*, 46 Cal.4th at p. 418.)

From early on, our case law has distinguished between amendment and revision in similar terms: "The very term 'constitution' implies an instrument of a permanent and abiding nature, and the provisions contained therein for its revision indicate the will of the people that the underlying principles upon which it rests, as well as the substantial entirety of the instrument, shall be of a like permanent and abiding nature. On the other hand, the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument as will effect an improvement, or better carry out the purpose for which it was framed. Experience may disclose defects in some of its details, or in the practical application of some of the principles or limitations which it contains. The changed condition of affairs in different parts of the state, or the changes of society or time, may demand the removal of some of these limitations, or an extended application of its principles. So, too, some popular wave of sociological reform, like the abolition of the death penalty for crime, or a prohibition against the manufacture or sale of intoxicating liquors, may induce a legislature to submit for enactment, in the permanent form of a constitutional prohibition, a rule which it has the power itself to enact as a law, but which might be of only temporary effect." (*Livermore v. Waite* (1894) 102 Cal. 113, 118–119.)

In 1948, we held in *McFadden* that a proposed initiative was an impermissible revision because its effect would have been to "substantially alter the purpose and to attain objectives clearly beyond the lines of the Constitution as now cast" rather

than working " 'within the lines of the original instrument' " to achieve " 'an improvement or better carry out the purpose for which it was framed.' " (*McFadden, supra,* 32 Cal.2d at p. 350.) *McFadden* involved a preelection challenge to a proposed initiative that would have repealed or substantially altered "at least 15 of the 25 articles" contained in the Constitution at that time, while also introducing at least four new topics to the Constitution and "substantially curtail[ing]" the legislative and judicial functions of the state government. (*Id.* at p. 345.) Our summary of the initiative and its effects spanned more than 10 pages (*id.* at pp. 334–345) and did "not purport to be exhaustive" (*id.* at p. 345), "demonstrat[ing] the wide and diverse range of subject matters proposed to be voted upon, and the revisional effect which it would necessarily have on our basic plan of government" (*id.* at pp. 345–346).

"In 1956, the California Legislature created a Citizens Legislative Advisory Commission to study and evaluate the organization and procedures of the Legislature, and a few years later that commission was requested to study and to provide a recommendation with regard to problems and methods of constitutional revision." (*Strauss, supra,* 46 Cal.4th at p. 425.) In response to the commission's recommendations, the Legislature approved and submitted to the voters a constitutional amendment to permit the Legislature to submit constitutional revisions, as well as amendments, to the electorate for approval. Among the ballot materials accompanying this measure was the following description from the Legislative Counsel distinguishing between an amendment and a revision: "Under existing provisions the Legislature can only propose 'amendments,' that is measures which propose changes specific and limited in nature. 'Revisions,' i.e.,

proposals which involve broad changes in all or a substantial part of the Constitution, can presently be proposed only by convening a constitutional convention." (Ballot Pamp., Gen. Elec. (Nov. 6, 1962) analysis of Prop. 7 by Legis. Counsel, p. 13.) The voters adopted the amendment as Proposition 7 at the November 1962 general election. (*Strauss*, at pp. 425–426.)

In *Amador Valley*, *supra*, 22 Cal.3d 208, we considered multiple challenges to article XIII A, which had been adopted by the voters in 1978 as Proposition 13. Proposition 13 "contain[ed] four distinct elements": (1) "a limitation on the *tax rate* applicable to real property"; (2) "a restriction on the *assessed value* of real property"; (3) a requirement of a two-thirds vote of the Legislature for any change in state tax law with the purpose of increasing revenues, along with a prohibition on new ad valorem taxes on real property and on sales or transaction taxes on real property sales; and (4) "a restriction upon *local* taxes," requiring a two-thirds vote of local electors to impose special taxes. (*Amador Valley*, at p. 220.) Proposition 13 also included general provisions relating to the effective dates and severability of the new constitutional article. (*Amador Valley*, at p. 220; see *id.* at p. 257 [reproducing complete text of the initiative].)

Among other claims, the petitioners in *Amador Valley* argued that the new article XIII A "represents such a drastic and far-reaching change in the nature and operation of our governmental structure that it must be considered a 'revision' of the state Constitution rather than a mere 'amendment' thereof." (*Amador Valley*, *supra*, 22 Cal.3d at p. 221.) We first reviewed *Livermore* and *McFadden*, and said those decisions together "mandate that our analysis . . . must be both quantitative and qualitative in nature. For example, an enactment which is so

extensive in its provisions as to change directly the 'substantial entirety' of the Constitution by the deletion or alteration of numerous existing provisions may well constitute a revision thereof. However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also." (*Amador Valley*, at p. 223.) Applying this framework, we said that quantitatively Proposition 13 "comprises approximately 400 words and . . . is limited to the single subject of taxation (with particular emphasis upon real property taxation)." (*Amador Valley*, at p. 224.) And qualitatively, we rejected the argument that Proposition 13 would result in the loss of "home rule" or convert the state from a "republican" to a "democratic" form of government. (*Amador Valley*, at p. 224.) We said that unlike the measure at issue in *McFadden*, the changes effected by Proposition 13 "operate functionally within a relatively narrow range to accomplish a new system of taxation which may provide substantial tax relief for our citizens. We decline to hold that such a limited purpose cannot be achieved directly by the people through the initiative process." (*Amador Valley*, at p. 228.)

Since *Amador Valley*, we have deployed the same mode of analysis in numerous cases. (See *People v. Frierson* (1979) 25 Cal.3d 142, 186–187; *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 260–261; *In re Lance W.* (1985) 37 Cal.3d 873, 891–892; *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 349–355 (*Raven*); *Legislature v. Eu, supra*, 54 Cal.3d at pp. 506–512; *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1046–1047; *Strauss, supra*, 46 Cal.4th at pp. 440–457.) The quantitative aspect of the inquiry has become less significant since the adoption of the single-subject rule in 1948, the year we decided *McFadden*. (Art. II, § 8, subd. (d).) Thus,

our cases since *McFadden* have focused primarily on the qualitative analysis.

As we summarized in *Strauss*, "the numerous past decisions of this court that have addressed this issue all have indicated that the type of measure that may constitute a revision of the California Constitution is one that makes 'far reaching changes in the nature *of our basic governmental plan*' (*Amador* [*Valley*], *supra*, 22 Cal.3d 208, 223, italics added), or, stated in slightly different terms, that 'substantially alter[s] *the basic governmental framework set forth in our Constitution*.' (*Legislature v. Eu*, *supra*, 54 Cal.3d 492, 510, italics added.)" (*Strauss*, *supra*, 46 Cal.4th at p. 441.) For example, "an enactment which purported to vest all judicial power in the Legislature would amount to a revision without regard either to the length or complexity of the measure or the number of existing articles or sections affected by such change." (*Amador Valley*, *supra*, 22 Cal.3d at p. 223.)

As it turns out, this example set forth in *Amador Valley* presaged our holding in *Raven* that a provision of Proposition 115, a 1990 ballot initiative titled the "Crime Victims Justice Reform Act," was an improper constitutional revision. (*Raven*, *supra*, 52 Cal.3d at pp. 340–341.) In *Raven*, a postelection case, our finding of invalidity focused on one specific provision of Proposition 115: an amendment to article I, section 24 of the state Constitution. Section 24, as originally enacted in 1974, provided in relevant part: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." Proposition 115 would have added the following proviso: " 'In criminal cases the rights of a defendant to equal protection of the laws, to due process of law, to the assistance of counsel, to be personally present with

counsel, to a speedy and public trial, to compel the attendance of witnesses, to confront the witnesses against him or her, to be free from unreasonable searches and seizures, to privacy, to not be compelled to be a witness against himself or herself, to not be placed twice in jeopardy for the same offense, and not to suffer the imposition of cruel or unusual punishment, shall be construed by the courts of this state in a manner consistent with the Constitution of the United States. This Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States, nor shall it be construed to afford greater rights to minors in juvenile proceedings on criminal causes than those afforded by the Constitution of the United States.'" (*Raven*, at p. 350.)

The petitioners in *Raven* argued that "the measure has in essence 'vested' or 'delegated' all judicial interpretive power respecting those rights in or to the *federal* courts." (*Raven*, *supra*, 52 Cal.3d at p. 351.) We agreed. Referring to the example above from *Amador Valley*, we explained: "Proposition 115 contemplates a similar qualitative change. In essence and practical effect, new article I, section 24, would vest all judicial *interpretive* power, as to fundamental criminal defense rights, in the United States Supreme Court. From a qualitative standpoint, the effect of Proposition 115 is devastating." (*Raven*, at p. 352.) Such a change "would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect." (*Ibid.*) The measure "substantially alters the preexisting constitutional scheme or framework heretofore extensively and repeatedly used by courts in interpreting and enforcing state constitutional protections. It directly contradicts the well-established jurisprudential

principle that, 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort . . . .' [Citations.] In short, in the words of *Amador* [*Valley*], . . . this 'relatively simple enactment [accomplishes] . . . such far reaching changes in the nature of our basic governmental plan as to amount to a revision . . . .' " (*Id.* at pp. 354–355.)

## B.

When evaluating whether a voter initiative constitutes a valid amendment or invalid revision, we examine the challenged measure in its entirety. (*Amador Valley*, *supra*, 22 Cal.3d at p. 221.) While a single provision of an initiative may constitute a revision standing alone (see *Raven, supra*, 52 Cal.3d at pp. 340–341), a proposed initiative may also be revisionary based on its combined effects. (*McFadden, supra*, 32 Cal.2d at pp. 345–346.) Viewed in isolation, one provision may not be so impactful as to change the " 'nature *of our basic governmental plan*' " (*Strauss, supra*, 46 Cal.4th at p. 441), yet it is possible that the collective impact of multiple provisions may accomplish such a change.

Holistic analysis of an initiative measure's effects is particularly appropriate here because the question before us concerns whether the initiative, in its entirety, may appear on the ballot. While in postenactment review, courts may sometimes sever invalid provisions from valid ones, there is no precedent for granting severance as a remedy in the preelection context. (Cf. *Jones, supra*, 21 Cal.4th at p. 1168 ["when an initiative measure violates the single-subject rule, severance is not an available remedy"]; *Bennett v. Drullard* (1915) 27 Cal.App. 180, 183–185 (*Bennett*) [reasoning, based on the

language of the city charter at issue, that courts lack the authority to modify proposed initiatives by severance or amendment once they have qualified for the ballot].)

Proponent has not requested severance in this case. A group of local taxpayers' associations, appearing as amici curiae in support of Proponent, suggest that we sever "the offending provisions [while] retaining those that do not suffer from the defects asserted by Petitioners." But the voters who sign initiative petitions understand that their signatures support putting the entirety of the measure before the electorate. Allowing or directing the Secretary to modify the initiative text before it is presented on the ballot may frustrate that intent. (*Bennett, supra*, 27 Cal.App. at p. 185.) It could also lead to manipulation of initiative proposals, whereby invalid provisions are included at the signature-gathering stage to facilitate ballot qualification, only to be deleted later by judicial directive. (*Id.* at p. 184.) Conversely, permitting the Secretary to submit the entire text of an initiative to the electorate after this court has found its most significant provisions invalid "would confuse the electorate and mislead many voters into casting their ballot on the basis of provisions which had already been found invalid." (*American Federation of Labor*, *supra*, 36 Cal.3d at p. 716.)

We therefore proceed by considering the TPA as it would be presented to voters — as a whole. We discuss three categories of changes that, according to Petitioners and their amici curiae, effect a revision of our basic plan of government. We focus on their arguments that the TPA would transform (1) the Legislature's power to levy taxes, (2) the balance of power among the Legislature, state executive agencies, and the electorate over the setting of fees, and (3) the authority of local

government agencies to set fees without legislative approval or the possibility of referendum.

### 1.

From the state's founding, the Legislature has had broad authority to levy taxes. As Proponent notes, the 1849 Constitution directed the Legislature to "restrict" local governments' powers of taxation (Cal. Const. of 1849, art. IV, § 37), while the 1879 Constitution prohibited the Legislature from imposing taxes on local governments or their inhabitants for "municipal purposes" (Cal. Const. of 1879, art. XI, § 12). The 1879 Constitution also exempted from taxation property owned by the state or federal government, as well as public schools and local governments (Cal. Const. of 1879, art. XIII, § 1), and prohibited poll taxes on certain people (*id.*, § 12). "Generally," however, "the Legislature is supreme in the field of taxation, and the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it." (*Delaney v. Lowery* (1944) 25 Cal.2d 561, 568; see *The Gillette Co. v. Franchise Tax Bd.* (2015) 62 Cal.4th 468, 477 [same].) In describing article XIII, section 24, subdivision (a), which was part of the original 1879 Constitution and declares that "[t]he Legislature may not impose taxes for local purposes but may authorize local governments to impose them," we have said this provision operates as "a restriction on the Legislature's otherwise *plenary power of taxation*" under the California Constitution. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 247 (*Guardino*), italics added.)

It is true that starting in the 1970s, a series of initiatives have circumscribed the Legislature's and local governments' tax

authority, although in different ways. "The series of reforms began with Proposition 13, a ballot initiative passed in 1978 to cap increases in property taxes and assessments, as well as other state and local taxes." (*Wilde, supra*, 9 Cal.5th at p. 1112.) Among its effects, Proposition 13 enacted section 3 of article XIII A, which requires a two-thirds vote of both houses of the Legislature for "any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto," while prohibiting any "new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property." (See *Amador Valley, supra*, 22 Cal.3d at p. 248.) Proposition 13 also imposed "a restriction upon *local* taxes" by requiring " 'special taxes' " to be approved by a two-thirds vote of the local electorate. (*Amador Valley*, at p. 220.)

"Then, in 1996, voters passed Proposition 218, which further curbed state and local government authority to generate revenue through taxes and other exactions." (*Wilde, supra*, 9 Cal.5th at p. 1112.) Proposition 218 extended Proposition 13's limitations on property tax assessments at both the state and local levels, and restricted local governments from imposing any taxes without voter approval. (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1200; see art. XIII C, § 2, subds. (b), (d).) We have upheld voter approval requirements for local taxes on the ground that local governments "have no inherent power to tax" and instead derive their taxing authority from the Legislature. (*Guardino, supra*, 11 Cal.4th at p. 248, citing art. XIII, § 24, subd. (a).) The "Legislature's authority to grant taxing power to local governments . . . includes the authority to prescribe the terms and conditions under which local governments may exercise

that power," such as voter approval requirements. (*Ibid.*; see *id.* at p. 250.)

"Finally, in 2010, voters approved Proposition 26, which expanded the reach of these limitations by broadening the definition of 'tax' " to cover a wider set of government exactions. (*Wilde, supra*, 9 Cal.5th at p. 1112.) These definitional changes affected which charges are subject to the supermajority vote requirement in the Legislature or voter approval requirements at the local level for new taxes. (Cf. *Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 786 [describing Proposition 26's amendments to the state and local definition of "tax" in art. XIII A, § 3 and art. XIII C, § 1, respectively].)

Thus, Proposition 13 and its progeny withdrew the Legislature's authority to enact certain types of taxes and imposed heightened vote requirements for any statutory change in taxes for the purpose of increasing revenues. These initiatives also made any local tax subject to voter approval. Characterizing the TPA as simply more of the same, Proponent argues that "Petitioners do not explain, nor can they explain, how [the] TPA's voter approval requirement is more damaging to their legislative power than any of the prior constitutional amendments and initiative statutes repealing a tax or fixing the rate and manner of assessing a tax."

This characterization belies the significance of the TPA, which would transform the process of levying state taxes that has existed since the state's founding. The TPA would prevent the Legislature from enacting *any* new tax without voter approval. Although Proponent argues that California's very first constitution required voter approval of general obligation bond debt (Cal. Const. of 1849, art. VIII) and that the 1879

Constitution restated the same (Cal. Const. of 1879, art. XVI, § 1), the specific carveout for bond debt in the original constitutions, adopted by constitutional conventions that otherwise retained the Legislature's plenary authority over other forms of taxation and revenue, only underscores the significance of extending voter approval across the entire field of taxation.

So central is the authority to levy taxes that tax legislation is exempt from referendum. Like the initiative power, the referendum power was enacted in 1911. (*Wilde*, *supra*, 9 Cal.5th at p. 1111.) Whereas the initiative power "allows voters to propose new measures and place them on the ballot for a popular vote," the referendum power "allows voters to weigh in on laws that have already been passed by their elected representatives." (*Ibid.*) "Any voter or group of voters that gathers enough signatures can place a legislative enactment on the ballot for an up or down vote. A referendum suspends operation of the law until it is approved by a majority of voters." (*Ibid.*; see art. II, § 9, subd. (a); *id.*, § 10, subd. (a).) The referendum power is subject to certain exceptions; as relevant here, "statutes providing for tax levies or appropriations for usual current expenses of the State" are exempt from referendum. (Art. II, § 9, subd. (a).) "One of the reasons, if not the chief reason, why the Constitution excepts from the referendum power acts of the Legislature providing for tax levies or appropriations for the usual current expenses of the state is to prevent disruption of its operations by interference with the administration of its fiscal powers and policies." (*Geiger v. Board of Supervisors* (1957) 48 Cal.2d 832, 839–840 (*Geiger*).)

Although we have recognized that this reasoning does not preclude voter approval requirements for local taxes (*Guardino*,

*supra*, 11 Cal.4th at p. 245), we have never before considered a voter approval requirement imposed on the Legislature like the one at issue here. In the context of local governments, which "have no inherent power to tax" (*id.* at p. 248), we said in *Guardino* that voter approval requirements " 'always will be known in advance . . . and thus the local entity will not include the anticipated tax revenue in its enacted budget until after the electorate has approved the tax' " (*id.* at pp. 245–246). But it is a different question whether such uncertainty concerning *state* tax revenue would be disruptive to the basic operations of state government, which "provid[e] for the public welfare and the benefit of the entire people of the state" (*People v. Central Pacific R. R. Co.* (1894) 105 Cal. 576, 584) and include substantial subventions to local governments (art. XIII B, § 6). We think it clear that a voter approval requirement for any new state tax measure would constitute a significant 'interference with the administration of [the Legislature's] fiscal powers and policies.' " (*Geiger, supra*, 48 Cal.2d at p. 840.)

Indeed, the TPA would strip the Legislature of authority to promptly raise revenues when necessary. The Constitution currently provides that "statutes providing for tax levies or appropriations for the usual current expenses of the State . . . shall go into effect immediately upon their enactment." (Art. IV, § 8, subd. (c)(3).) The Constitution thus directs that the Legislature's fiscal decisions must be effective immediately. This is particularly important when changes in revenue or appropriations are needed to respond to state or local emergencies. Petitioners and amici curiae note multiple instances in which the Legislature has used this authority to respond swiftly to natural and financial disasters. By requiring the electorate to approve any new tax or any change in the use

of any special tax revenue previously approved by the voters, the TPA would preclude the state from raising new revenue or redirecting any existing special tax revenue in light of unforeseen events, until after a statewide election. (See TPA, § 4 [proposed art. XIII A, § 3, subd. (b)(1), (B)].)

Proponent says "the Legislature (and local governments) are free to call a special election at any time to ask voters to approve taxes needed for an emergency reason, or even for no reason at all." But a special election requires time for legislative development and adoption of a ballot measure, legal review of the measure, preparation of the ballot and associated materials, and voter education and outreach. The Elections Code provides for a minimum of 131 days between the adoption of a proposed ballot measure by the Legislature and the earliest date of a statewide special election. (Elec. Code, § 9040.) This period does not account for time needed on the front end to prepare a draft ballot measure for consideration by the Assembly and Senate, and it may not fully account for time needed on the back end to prepare the ballot measure for a statewide election.

Further, Proponent argues that the TPA simply moves the taxing power from the Legislature to the electorate, thereby keeping that power within the legislative branch. That may be true, but it is also true that such a change would significantly alter the legislative process and framework for exercising the taxing power. The Legislature's duty to ensure the welfare of our state and its people includes responsibility for fiscal planning, both short-term and long-term, that the Legislature historically has had authority to exercise without voter approval. In "our continuing representative and republican form of government" (*Amador Valley*, *supra*, 22 Cal.3d at p. 228), the Legislature's deliberations on tax legislation may

include public hearings, review by multiple committees, amendments, bargaining, and compromise. The Legislature may enlist and apply expertise in crafting legislation, and may develop its own expertise through regular consideration of tax proposals. A voter approval requirement would "add[] an important element of direct, active, democratic contribution by the people" (*ibid.*) in the form of an up or down vote on tax measures approved by the Legislature. Voters may consider information from a variety of sources, including statements in the voter information guide by the Legislative Analyst and by a measure's proponents and opponents, as well as information from various media, advertising, and other communication channels in the public square. We express no view on what process achieves the optimal balance among efficiency, accountability, transparency, and other interests. We observe only that requiring any new or higher tax levy to undergo voter approval would significantly alter the existing constitutional balance between direct democracy and representative democracy, with reverberations throughout the framework of our government.

Petitioners also contend that the effect of the TPA's statewide tax provision would be exacerbated by the requirements that each statute levying a new tax include "[a] specific and legally binding and enforceable limitation on how the revenue from the tax can be spent" and that "[a]ny proposed change to the use of the revenue from the tax shall be adopted by a separate act that is passed by not less than two-thirds of all members elected to each of the two houses of the Legislature and submitted to the electorate and approved by a majority vote." (TPA, § 4 [proposed art. XIII A, § 3, subd. (b)(1)(B)].) The cumulative effect of these taxing and spending limitations,

Petitioners argue, would revoke two of the Legislature's core powers and hinder the state's ability to " 'effectively resolve the truly fundamental issues' facing the State" because "[t]he Legislature simply could not rely on new tax revenues to meet emerging or urgent circumstances," like natural disasters.

In considering the TPA's spending power limitations, we note that Proposition 4 in 1979 added article XIII B to the state Constitution, commonly known as the "Gann limit," which caps per-person government spending at 1978–1979 levels.  (See *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 58–59 [describing art. XIII B].)  The Gann limit effected an arguably more significant change to the Legislature's spending power than what would be imposed by the TPA's proposed limit on the ability to reallocate special tax revenue without voter approval. Thus, the TPA's limitations on the Legislature's spending power do not add much to support a finding that the measure works a revision, although they contribute to the TPA's overall effect.

We conclude that the TPA would substantially transform the process for enacting new statewide tax legislation that has existed since the state's founding and that this transformation weighs significantly in favor of finding that the TPA would effect a constitutional revision.

## 2.

Beyond eliminating the Legislature's ability to levy taxes without prior voter approval, the TPA shifts power between the executive branch and the legislative branch in three ways. First, the TPA would subject a broader range of state revenue actions to the two-thirds legislative vote requirement imposed by Proposition 13.  Article XIII A, section 3, subdivision (a) currently provides that "[a]ny change in state *statute* which

results in any taxpayer paying a higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature." (Italics added.) The TPA would amend this provision to require a two-thirds vote not just on any "state statute" effecting such a change, but on any "state law" doing so. (Compare art. XIII A, § 3, subd. (a) with TPA, § 4 [proposed art. XIII A, § 3, subd. (b)(1)].) Similar changes are proposed at the local level, as discussed below. (*Post*, at pp. 41–49.)

Second, the TPA would enact the following new subdivision within article XIII A: "Any change in state law which results in any taxpayer paying a new or higher exempt charge must be imposed by an act passed by each of the two houses of the Legislature. Each act shall specify the type of exempt charge as provided in subdivision (e), and the amount or rate of the exempt charge to be imposed." (TPA, § 4 [proposed art. XIII A, § 3, subd. (c)].) The TPA makes clear that "state law" as used in these two provisions would include executive and agency actions; it defines "state law" to include "any state statute, state regulation, state executive order, state resolution, state ruling, state opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by the legislative or executive branches of state government," while excluding "actions taken by the Regents of the University of California, Trustees of the California State University, or the Board of Governors of the California Community Colleges." (*Ibid.* [proposed art. XIII A, § 3, subd. (h)(4)].)

Petitioners argue that the effect of these two provisions would be to "revoke[] the power of the Governor or state administrative agencies to impose or increase any charge, even

those that are not a 'tax.' " Petitioners contend these changes "would dramatically slow if not impede critical government operations and force the Legislature and voters to become involved in the minutiae of governance. For example, the Measure could deprive the State Board of Equalization or Department of Health Care Services of the ability to promulgate many of the regulations under their jurisdiction, and require the Legislature and voters to assume tasks that could include setting the annual fee for fishing licenses and parking fines." "As a consequence of these two changes" (and analogous changes at the local level, discussed below), they say, "administrative agencies would lose the power to do much of the work they do today under legislatively delegated authority, such as assessing fees for the disposal of hazardous waste (at the state level) and setting fees for trash collection or charges for health care at public hospitals (at the local level)." According to Petitioners, the TPA would deprive the Legislature of the ability to delegate tasks to administrative agencies with greater expertise if a task "results in any taxpayer paying a new or higher exempt charge." (TPA, § 4 [proposed art. XIII A, § 3, subd. (c)].)

Third, the TPA would expand the referendum power to encompass all fees imposed by state and local agencies. As a result of its new definition of "tax," the TPA would narrow the tax exception to the referendum power set forth in article II, section 9 of the Constitution and would exclude every newly defined "exempt charge" from the referendum exception. (See TPA, §§ 4 [proposed art. XIII A, § 3, subd. (d) defining state "tax" as used in art. II, § 9], 5 [proposed art. XIII C, § 1, subd. (i) defining local "tax" as used in art. II, § 9].) Petitioners allege that this would subject thousands of government fees and charges to referendum, "including fees for trash collection and

water service, sewer connections, permits and licenses, cemeteries, and parks and recreation."

We agree with Petitioners that the TPA would significantly rework the current balance between legislative and executive functions at the state and local level. Legislative delegation of administrative tasks, including assessing fees and other charges, is not new. We observed in 1917 that "[e]ven a casual observer of governmental growth and development must have observed the ever-increasing multiplicity and complexity of administrative affairs — national, state, and municipal — and even the occasional reader of the law must have perceived that from necessity, if for no better grounded reason, it has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are intrusted to departments, boards, commissions, and agents." (*Gaylord v. City of Pasadena* (1917) 175 Cal. 433, 436 (*Gaylord*).) "No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law." (*Id.* at pp. 436–437.) On this latter point, we cited the high court's observation in 1907 that "a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends would be 'to stop the wheels of government' and bring about confusion, if not paralysis, in the conduct of the public business." (*Union Bridge Co. v. United States* (1907) 204 U.S. 364, 387.)

More recently, the Court of Appeal in *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205 (*Schabarum*) observed: "It may well be impossible, without risking paralysis in the conduct of the public business, to return to a form of government in which all legislative and judicial functions are performed solely and directly by the Legislature and by the courts. [Citation.] But it is certainly too late in the day to return to such a form of government without effecting a constitutional revision." (*Id.* at p. 1224.)

Proponent does not dispute the significance of these changes. At oral argument, Proponent said the TPA would accomplish a "rollback to a condition that existed decades ago, prior to the Legislature deciding that it was going to empower executive agencies to raise revenue." Indeed, Proponent explained that a purpose of the TPA is to "restore" California to a time before modern administrative practice, when "all fees were approved, proposed, and enacted by statute."

Petitioners assert that these changes would "reorder the balance of powers by effectively (1) prohibiting the Legislature from delegating certain powers to the executive branch; (2) prohibiting the executive branch from exercising certain delegated powers; and (3) compelling the Legislature to perform administrative acts." To illustrate the scope of the change, they point to several statutes that delegate duties to administrative agencies to impose regulatory and other fees that are not deemed "taxes" under current law or the TPA. (See, e.g., Bus. & Prof. Code, § 2340.8 [Medical Board of California to determine fees relating to the Physician and Surgeon Health and Wellness Program]; Food & Agr. Code, §§ 33291–33298 [Department of Food and Agriculture to establish certain inspection fees for milk production facilities]; Gov. Code, § 12182 [Secretary of

State to establish fees relating to business programs]; Health & Saf. Code, §§ 13110 [State Fire Marshal to establish fire safety fees], 18870.3 [Department of Housing and Community Development to establish fees relating to mobilehome parks]; *id.*, §§ 25205.2.1, 25205.5.01, 25205.6.1 [Board of Environmental Safety to establish hazardous waste fees]; Lab. Code, § 5307.1 [Division of Workers' Compensation to establish fees for medical services]; Pub. Util. Code, § 728 [Public Utilities Commission to adjust utility rates].)

As these examples suggest, state agencies set and administer a variety of fees. Among the more than 200 agencies to which the Legislature has delegated rulemaking authority, other examples abound. The Department of Motor Vehicles lists more than 70 different fees on its website and reports that it collects over $8 billion in annual revenue. (Dept. of Motor Vehicles, *Licensing Fees* <https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/licensing-fees/> [as of June 20, 2024]; *id.*, *DMV Functions* <https://www.dmv.ca.gov/portal/about-the-california-department-of-motor-vehicles/> [as of June 20, 2024]; see Office of Administrative Law, *About the Office of Administrative Law* <https://oal.ca.gov/about-the-office-of-administrative-law/> [as of June 20, 2024]; all Internet citations in this opinion are archived by year, docket number and case name at <http://www.courts.ca.gov/38324.htm>.) Also, the Legislature has authorized the Board of Environmental Safety within the Department of Toxic Substances Control to promulgate various fees for facilities and entities that generate or process hazardous waste and to adjust those rates as frequently as once per year, subject to certain statutory maximums. (See, e.g., Health & Saf. Code, § 25205.2.1, subd. (a).) The Legislature has further provided that such

regulations "may be adopted as an emergency regulation . . . as necessary for the immediate preservation of the public peace, health, and safety, and general welfare." (*Id.*, subd. (e).)

Proponent says the TPA is "merely an extension" of the Legislature's authority to set or limit fees for state agencies, offering many examples where the Legislature has done just that, including some of the examples discussed above. (See, e.g., Bus. & Prof. Code, §§ 1724 [authorizing the Dental Board of California to establish fees relating to the practice of dentistry, subject to statutory limits], 23320 [setting statutory fees to be charged by the Department of Alcoholic Beverage Control]; Gov. Code, § 70600 et seq. [statutory filing fees and other civil fees that may be charged by Superior Courts]; Veh. Code, § 9101 et seq. [setting vehicle registration and weight fees to be charged by the Department of Motor Vehicles]; Health & Saf. Code, § 25205.2 et seq. [setting maximum fees to be charged by the Board of Environmental Safety].)

But the fact that the Legislature has chosen to set or limit certain fees does not answer Petitioners' central point that the Legislature today is authorized to decide whether to set certain fees itself or to delegate the task to various agencies. Under the TPA, the Legislature would be stripped of that authority and would instead be tasked with considering and voting on a multitude of fees currently set by agencies. The TPA says this approach will ensure that "all fees and other charges are passed or rejected by . . . a governing body elected by voters and not unelected and unaccountable bureaucrats." (TPA, § 3, subd. (a).) Whether the proposed changes will in fact promote transparency or accountability, and how such interests might be balanced against considerations of agency expertise, administrative efficiency, or practicality are not for us to say.

What we decide here is only whether the changes would substantially alter the current constitutional scheme, in which legislative delegation of power to administrative agencies is permissible, widespread, and fundamental to the operation of government. (*Schabarum*, *supra*, 60 Cal.App.4th at p. 1224.)

It is no answer to say that if the Legislature can grant or withdraw agency authority in this area, so too can the voters under the initiative power. Petitioners do not claim this change is beyond the electorate's power to enact; instead, they claim it is beyond the scope of an initiative amendment to entirely withdraw from the Legislature its power to delegate fee-setting authority to administrative agencies. As noted, the TPA requires "[a]ny change in state law which results in any taxpayer paying a new or higher exempt charge" to be enacted by the Legislature, and it defines "state law" expansively to include "any state statute, state regulation, state executive order, state resolution, state ruling, state opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by the legislative or executive branches of state government" apart from our public universities and community colleges. (TPA, § 4 [proposed art. XIII A, § 3, subds. (c), (h)(4)].) Shifting the authority to impose any such fees or other charges from administrative agencies to the Legislature would materially reshape the nature and volume of the Legislature's everyday work and its overall function and efficacy in our system of governance.

We also find the TPA's expansion of the referendum power to cover all agency fines and fees that qualify as exempt charges to be a significant change. In *Wilde*, this court examined the referendum power and explained why it was necessarily limited. The referendum power allows a small minority of voters to place

a newly enacted law on the ballot for an up or down vote and suspend its operation until it is approved by the majority of voters. (*Wilde, supra,* 9 Cal.5th at p. 1111; see art. II, § 9, subd. (b) ["A referendum measure may be proposed by presenting to the Secretary of State, . . . a petition certified to have been signed by electors equal in number to 5 percent of the votes for all candidates for Governor at the last gubernatorial election"].) Referendum "poses a distinct potential for disruption that sets it apart from the ordinary legislative process." (*Wilde,* at p. 1122.) For that reason, "statutes providing for tax levies or appropriations" have been excluded from the referendum power since its inception. (Art. II, § 9, subd. (a); see *Wilde,* at p. 1122 & fn. 8.) "Article II, section 9's exemptions from referendum reflect a recognition that in certain areas, legislators must be permitted to act expediently, without the delays and uncertainty that accompany the referendum process. All of the exemptions — for urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the state — are for 'measures having special urgency, a delay in the implementation of which could disrupt essential governmental operations.' " (*Wilde,* at pp. 1122–1123.)

In light of this purpose, we held in *Wilde* that the tax exception to the referendum power includes not only general-purpose exactions such as sales and income taxes but also any charge that supports an essential governmental function, like public utility fees. (*Wilde, supra,* 9 Cal.5th at pp. 1123–1124.) The TPA is expressly intended to overrule *Wilde* and narrow the Constitution's tax exception to the referendum power. (TPA, § 3, subd. (e).) Proponent contends that this change is incremental because *Wilde* held only that a specific revenue

measure — a city's water utility rate — was a "tax" for the purposes of the Constitution's referendum exception.   (See *Wilde, supra,* 9 Cal.5th at p. 1126.)  Further, Proponent argues that the voters have rarely exercised their right to subject fees to referendum at the state or local level in the century prior to our decision in *Wilde*.

We find it significant that under the TPA, *every* nontax government fee or charge would be subject to referendum, including those necessary to fund essential services.  All state and local charges, no matter how essential, would be subject to delays that could be triggered by a small minority of voters in a given jurisdiction.   The existing constitutional scheme recognizes that governments must be able to rely on the revenue measures they enact, and they " 'cannot have the viability of such measures continually placed in doubt by the possibility that a referendum may be initiated by a relatively small percentage of the electorate.' " (*Guardino, supra,* 11 Cal.4th at p. 245.)  Expanding the referendum power as the TPA proposes would transform an occasionally used mechanism for government accountability into a ready tactic for fiscal disruption.   We conclude that the TPA's requirement that all statewide nontax government charges be legislatively enacted would, like the TPA's state tax voter-approval requirement, effect a significant change in how our state government raises revenue.

**3.**

Petitioners contend that the TPA would also "eliminate much of the power of local executive agencies to take actions that result in higher taxes or fees, requiring local legislative bodies and voters to assume much of the work that executive agencies now do."   These changes, they argue, deprive local

legislators of their constitutional power to delegate administrative tasks. Local government amici curiae argue that the TPA thus "revises the structure of local government, fundamentally changing the responsibilities of local legislators and administrators, and stripping charter counties of their power to establish administrative structures and charter cities of their 'plenary authority' (Cal. Const., art. XI, § 5) to determine the roles and responsibilities of their officials." Further, they argue that the TPA's restrictions on the ability of state and local governments to raise revenue without voter approval or to enact fees not subject to referendum "transform[s] the constitutional relationship of state and local governments, making the latter dependent on the State for fiscal survival but stripping the State of the ability to provide necessary funding."

The Constitution distributes powers between the Legislature and local governments (art. XI, § 13) and provides for the Legislature's establishment of local governments, including counties and cities (*id.*, §§ 1, 2). Article XI, section 3 of the Constitution authorizes counties and cities to adopt and amend charters for their own governance by majority vote. (*Id.*, subd. (a).) In addition, the Constitution provides that county charters shall fix the terms, compensation, and removal of elected officials and other employees, as well as provide for performance of statutorily required functions. (*Id.*, § 4, subds. (c)–(f).) It likewise endows charter cities with "plenary authority" to provide for the terms, compensation, and removal of municipal officers and employees, and requires city charters to "make and enforce all ordinances and regulations in respect to municipal affairs," including the regulation of city police forces, city elections, and city government. (*Id.*, § 5, subd. (a); *id.*, subd. (b).) The Constitution further provides the authority

for local governments to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (*Id.*, § 7.) It also authorizes municipal corporations to establish and operate public utilities (*id.*, § 9) and prohibits the Legislature from delegating municipal functions to private parties (*id.*, § 11). The Constitution requires the state to reimburse local governments for the cost of any new mandate (art. XIII B, § 6), though the Legislature has provided that reimbursement is not necessary if the local agency has the authority to levy service charges or other fees sufficient to pay for the mandated program or increased level of service (Gov. Code, § 17556, subd. (d)).

Article XIII, section 24, subdivision (a) of the Constitution provides that the "Legislature may not impose taxes for local purposes but may authorize local governments to impose them." The first clause of this provision is a "restriction on the Legislature's otherwise plenary power of taxation"; it bars the Legislature from imposing taxes when the "proceeds are devoted to purely 'local' purposes." (*Guardino, supra*, 11 Cal.4th at p. 247.) The second clause "is a confirmation of the Legislature's authority to grant the taxing power to local governments insofar as necessary to enable them to impose such local taxes if they see fit." (*Id.* at pp. 247–248.) Such a grant of power "is an essential prerequisite to all local taxation, because local governments have no inherent power to tax." (*Id.* at p. 248.)

The Legislature has long conditioned the exercise of local taxing power on voter approval. (*Guardino, supra*, 11 Cal.4th at pp. 250–252.) Some statutes that authorize local governments to levy various taxes require approval by a simple majority of voters (*id.* at p. 251 & fn. 20), while others require a two-thirds vote (*id.* at p. 251, fn. 21). In addition, the series of

initiative reforms that have limited the Legislature's authority to impose statewide taxes (*ante*, at pp. 25–27) also placed constitutional limitations on local governments' ability to levy property, special, and general taxes. Most relevant here is the 1996 passage of Proposition 218, which added article XIII C requiring majority voter approval of local "general taxes" at a general election and reaffirming the two-thirds voter approval requirement for "special taxes." (Art. XIII C, § 2, subds. (b), (d); see *Cannabis Coalition*, *supra*, 3 Cal.5th at p. 930.) The article's definition of "tax" includes several exceptions, including charges for specific benefits or privileges, licensing fees, entrance fees, fines, and penalties. (Art. XIII C, § 1, subd. (e).) Proposition 218 also added article XIII D, which limits the ability of local governments to levy charges or fees upon property. (Art. XIII D, §§ 2, 4, 6; see *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 284–286.)

In 2017, we held in *Cannabis Coalition* that Proposition 218's requirement that local general taxes must first be submitted to the electorate at a regularly scheduled general election does not apply to local voter initiatives proposing general taxes; such initiatives may be submitted to voters at a special election. (*Cannabis Coalition*, *supra*, 3 Cal.5th at p. 936.) We explained that the voters, in enacting Proposition 218, did not clearly indicate that the election timing provision applied to the initiative power. (*Cannabis Coalition*, at p. 943.) And we said in dicta that special taxes introduced by initiative are not subject to article XIII C, section 2, subdivision (d)'s two-thirds vote requirement for the same reason. (*Cannabis Coalition*, at pp. 943–944.)

In response to *Cannabis Coalition*, the TPA would amend section 2 of article XIII C to state that the two-thirds voter

approval requirement for local special taxes also applies to taxes submitted to the electorate by initiative. (TPA, § 6 [proposed art. XIII C, § 2, subd. (c)]; see *id.*, § 3, subd. (e) [stating the measure's intent "to reverse loopholes" in *Cannabis Coalition* and other court decisions].) The TPA further prohibits local governments from proposing a local tax in a charter city as a majority vote charter amendment. (*Id.*, § 6 [proposed art. XIII C, § 2, subd. (f)].) Finally, the TPA requires any proposal for a general tax to be labeled "for general government use" and prohibits the use of "advisory" measures to indicate that general tax revenue will, could, or should be used for a specific purpose. (*Ibid.* [proposed art. XIII C, § 2, subd. (d)(3)].)

As noted, the Constitution provides no inherent authority for local governments to raise taxes. (*Guardino, supra,* 11 Cal.4th at p. 248.) And the Constitution and various statutes have long subjected local tax levies to majority and supermajority voter approval requirements. (*Ante,* at pp. 25–26.) In other words, local governments have long been dependent on state appropriations for the revenue they need to function. To the extent that the TPA would subject local tax measures to heightened voter approval requirements or make local governments more dependent on appropriations from the Legislature, we conclude that these changes by themselves have limited significance, though the TPA may intensify the dependency.

But the TPA would go further. As with its proposed changes to state taxes, the TPA proposes to redefine local "tax" and "exempt charge" in ways that broaden the types of government exactions subject to voter or legislative approval. (TPA, § 5 [proposed art. XIII C, § 1, subds. (f), (i), (j)].) It would define "tax" to mean "every . . . levy, charge, or exaction of any

kind, imposed by a local . . . law that is not an exempt charge," including "any ordinance, resolution, regulation, ruling, opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by a local government." (*Ibid.* [proposed art. XIII C, § 1, subds. (f), (i)].) It would define local "exempt charge" to mean only reasonable charges imposed for a specific local government service that does not exceed the "actual" costs to the local government, and only those fines and penalties imposed "pursuant to adjudicatory due process." (*Ibid.* [proposed art. XIII C, § 1, subds. (i), (j)(1), (4)].) The TPA further requires that all local "exempt charges" must be enacted by the local legislative body by ordinance rather than imposed directly by a local executive branch agency. (*Id.*, § 6 [proposed art. XIII C, § 2, subd. (e)].) As noted, in response to our decision in *Wilde*, the TPA would also subject all local fines and fees, including utility rates, to voter referendum. (*Id.*, § 5 [proposed art. XIII C, § 1, subd. (i); redefining "tax" for purposes of Cal. Const., art. II, § 9].) Finally, the TPA would require new measures proposing taxes or new ordinances enacting exempt charges to specify their type and amount. (*Id.*, §§ 4 [proposed art. XIII A, § 3, subds. (b)(1), (c)], 6 [proposed art. XIII C, § 2, subds. (d), (e)].)

Taken together, these provisions of the TPA transform local revenue-raising by requiring that exempt charges go through legislative rather than administrative processes. For example, a local utility would no longer be able to adjust rates without a local governing body passing an ordinance, and a community center would no longer be able to impose user fee charges for facility rentals without engaging in a legislative process. (See TPA, § 6 [proposed art. XIII C, § 2, subd. (e)].) In addition, the TPA's directive that apart from local initiative,

"[o]nly the governing body of a local government . . . [may] impose any exempt charge" (*ibid.* [proposed art. XIII C, § 2, subd. (e)]), when read together with its definition that "impose" means "adopt, enact, reenact, create, establish, collect, increase or extend" (*id.*, § 4 [proposed art. XIII A, § 3, subd. (h)(3)]), suggests that a city council would have to take action before a local utility could request or collect customers' payments for their monthly bills. Further, the TPA's definition of an exempt charge would transform an overdue library book fine or an expired parking meter fine into a "tax" subject to voter approval if it is not imposed pursuant to an adjudicatory process. (*Id.*, § 5 [proposed art. XIII C, § 1, subd. (j)(4)].)

We conclude that the TPA's transformation of the administrative process of local fee-setting and collection into a legislative process supports Petitioners' claim that the TPA works a qualitative revision. The Constitution endows local governments with broad authority over their own operations to fulfill their constitutional mandate to provide public services like policing, elections, and utilities. (See art. XI, §§ 4, 5, 7; cf. *Wilde*, *supra*, 9 Cal.5th at p. 1123 [a city's ability to set water rates without disruption from referendum is necessary to ensuring its "ability to carry out one of its most basic and essential functions"].) We have long recognized that local governments may delegate their legislative authority to their executive or administrative officers and that such delegation has become "imperative" in light of the "ever-increasing multiplicity and complexity of [their] administrative affairs." (*Gaylord*, *supra*, 175 Cal. at p. 436; see *id.* at p. 440 [concluding that a city could "confer[] upon the city electrician judicial or legislative powers"].) By substantially altering the power of local governments to delegate decision-making authority to

47

their own agencies, the TPA would operate in a manner dissimilar to any of the prior initiatives that have restricted local governments' ability to raise revenue. Proponent does not dispute that the TPA would require local governing bodies to authorize the imposition and collection of utility bills, and to provide adjudicatory due process and legislative approval before imposing library fines (or else have such fines deemed a "tax" subject to voter approval). Such changes would substantially overhaul how local governments go about ensuring that everyday services are properly provided. In sum, the TPA would affect all local revenue measures — big or small, essential or nonessential — to an extent that leaves no aspect of government untouched.

Proponent says it is "quite common for a local legislative body (e.g., city council or board of supervisors) to approve a fee schedule for their locality." But neither of the fee schedules Proponent cites as examples — those of Beverly Hills and Chula Vista — encompasses the new types of "exempt charges" that would require legislative action (and, for some charges, adjudicatory due process), nor the new means by which taxes may be "imposed" under the TPA. (TPA, § 4 [proposed art. XIII A, § 3, subd. (h)(3)]; *id.*, § 6 [proposed art. XIII C, § 2, subd. (e)].) Further, Proponent provides no indication that these local legislative bodies' voluntary approval of a master fee schedule is the norm for most local governments. Finally, as local government amici curiae demonstrate, the fee schedules cited by Proponent may not even be compliant with the TPA because they vest discretion in local administrators to determine the actual amount charged for various services.

Proponent further cites Government Code section 66016, subdivision (b) for the proposition that the Legislature

"prohibits delegation of many types of local government fees." But this nondelegation provision applies only to a subset of land use fees. (Gov. Code, § 66016, subd. (d).) There is a sizable gulf between this provision and the categorical prohibition on local fee-setting delegation that the TPA would impose. In sum, the reassignment of local fee-setting from administrative to legislative processes would substantially alter the processes by which local governments raise revenue and, in so doing, would significantly alter the work of local government itself.

## C.

In recognizing the fundamental changes the TPA would make to the operation of state and local government, we express no view on its wisdom. The basic plan of our state government was set forth in the 1879 Constitution, and the electorate remains free to modify it through the appropriate procedures. The analysis above illuminates whether the TPA would "substantially alter the basic governmental framework set forth in our Constitution." (*Legislature v. Eu*, *supra*, 54 Cal.3d at p. 510.) We decide only whether the measure, taken as a whole, would accomplish a revision. Whether any individual component of the TPA would constitute a revision standing alone is a question we do not answer here.

No speculation regarding potential future consequences is needed to conclude that the TPA is a revision on its face. The measure would fundamentally restructure the most basic of governmental powers. The TPA would exclude the levying of new taxes from the Legislature's control by requiring voter approval of all such measures. In so doing, it would disturb the long settled understanding that "[t]he power of taxation is a power which the Legislature takes from the law of its creation,

for it is an indispensable power, without which it would become impossible for that body to perform its functions . . . ." (*Taylor v. Palmer* (1866) 31 Cal. 240, 252, disapproved on another ground in *Turney v. Dougherty* (1879) 53 Cal. 619, 620–621.) Further, the TPA would significantly alter the ability of state and local governments to delegate fee-setting authority to their executive or administrative officers (*Gaylord*, *supra*, 175 Cal. at pp. 436, 440) and ensure the provision of essential services (*Wilde*, *supra*, 9 Cal.5th at p. 1124). And the TPA would subject every revenue-raising measure enacted by state or local governments to voter approval or referendum, either because it is a tax that the voters must enact or because it is an exempt charge that can only be enacted by the legislative branch and thus becomes subject to referendum.

Moreover, by enacting these changes together, along with others noted above, the effects of the TPA on our state and local governments would be intensified. Whereas a restriction on the ability of local governments to raise revenue might previously have been offset by the power of the state to raise revenue, the TPA burdens both simultaneously. And while the expansion of what constitutes an exempt charge and the requirement that such charges be adopted legislatively rather than imposed by an agency are significant in and of themselves, the TPA's extension of the referendum power to these charges magnifies their effect and creates complications of its own. The TPA's voter approval requirements, its nondelegation rules, and its expansion of the referendum power to charges previously held to be essential operate together to fundamentally rework the fiscal underpinnings of our government at every level. The TPA would shift so much authority, in such a significant manner, that it would substantially alter our framework of government.

For these reasons, we conclude that the TPA would clearly "accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision" of the Constitution. (*Amador Valley*, *supra*, 22 Cal.3d at p. 223.) The measure exceeds the scope of the power to amend the Constitution via citizen initiative. (Art. II, § 8, subd. (a).) It is within the people's prerogative to make these changes, but they must be undertaken in a manner commensurate with their gravity: through the process for revision set forth in article XVIII of the Constitution.

## CONCLUSION

A peremptory writ of mandate shall issue, directing the Secretary of State to refrain from taking any steps to place Attorney General Initiative No. 21-0042A1, also known as Secretary of State Initiative No. 1935, on the November 5, 2024 election ballot or to include the measure in the voter information guide.

In light of the time constraints under which the Secretary of State is required to act, the opinion and judgment shall become final five days after it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A); see *Isaak v. Superior Court* (2022) 73 Cal.App.5th 792, 801.) Each party shall bear its own costs. (See *Strauss*, *supra*, 46 Cal.4th at p. 475; *Raven*, *supra*, 52 Cal.3d at p. 356.)

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

## APPENDIX

TEXT OF INITIATIVE

[Deleted codified text is denoted in ~~strikeout~~. Added codified text is denoted by *italics and underline*. We have put section titles in boldface to improve readability.]

**Section 1.  Title**

This Act shall be known, and may be cited as, the Taxpayer Protection and Government Accountability Act.

**Section 2.  Findings and Declarations**

(a)  Californians are overtaxed.  We pay the nation's highest state income tax, sales tax, and gasoline tax.  According to the U.S. Census Bureau, California's combined state and local tax burden is the highest in the nation.  Despite this, and despite two consecutive years of obscene revenue surpluses, state politicians in 2021 alone introduced legislation to raise more than $234 *billion* in new and higher taxes and fees.

(b)  Taxes are only part of the reason for California's rising cost-of-living crisis.  Californians pay billions more in hidden "fees" passed through to consumers in the price they pay for products, services, food, fuel, utilities and housing.  Since 2010, government revenue from state and local "fees" has more than doubled.

(c)  California's high cost of living not only contributes to the state's skyrocketing rates of poverty and homelessness, they are the [*sic*] pushing working families and job-providing businesses out of the state.  The most recent Census showed that California's population dropped for the first time in history, costing us a seat in Congress.  In the past four years, nearly 300

1

major corporations relocated to other states, not counting thousands more small businesses that were forced to move, sell or close.

(d) California voters have tried repeatedly, at great expense, to assert control over whether and how taxes and fees are raised. We have enacted a series of measures to make taxes more predictable, to limit what passes as a "fee," to require voter approval, and to guarantee transparency and accountability. These measures include Proposition 13 (1978), Proposition 62 (1986), Proposition 218 (1996), and Proposition 26 (2010).

(e) Contrary to the voters' intent, these measures that were designed to control taxes, spending and accountability, have been weakened and hamstrung by the Legislature, government lawyers, and the courts, making it necessary to pass yet another initiative to close loopholes and reverse hostile court decisions.

### Section 3. Statement of Purpose

(a) In enacting this measure, the voters reassert their right to a voice and a vote on new and higher taxes by requiring any new or higher tax to be put before voters for approval. Voters also intend that all fees and other charges are passed or rejected by the voters themselves or a governing body elected by voters and not unelected and unaccountable bureaucrats.

(b) Furthermore, the purpose and intent of the voters in enacting this measure is to increase transparency and accountability over higher taxes and charges by requiring any tax measure placed on the ballot — either at the state or local level — to clearly state the type and rate of any tax, how long it will be in effect, and the use of the revenue generated by the tax.

(c) Furthermore, the purpose and intent of the voters in enacting this measure is to clarify that any new or increased form of state government revenue, by any name or manner of extraction paid directly or indirectly by Californians, shall be authorized only by a vote of the Legislature and signature of the Governor to ensure that the purposes for such charges are broadly supported and transparently debated.

(d) Furthermore, the purpose and intent of the voters in enacting this measure is also to ensure that taxpayers have the right and ability to effectively balance new or increased taxes and other charges with the rapidly increasing costs Californians are already paying for housing, food, childcare, gasoline, energy, healthcare, education, and other basic costs of living, and to further protect the existing constitutional limit on property taxes and ensure that the revenue from such taxes remains local, without changing or superseding existing constitutional provisions contained in Section 1(c) of Article XIII A.

(e) In enacting this measure, the voters also additionally intend to reverse loopholes in the legislative two-thirds vote and voter approval requirements for government revenue increases created by the courts including, but not limited to, *Cannabis Coalition v. City of Upland, Chamber of Commerce v. Air Resources Board, Schmeer v. Los Angeles County, Johnson v. County of Mendocino, Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Commission,* and *Wilde v. City of Dunsmuir*.

**Section 4. Section 3 of Article XIII A of the California Constitution is amended to read:**

Sec. 3*(a) Every levy, charge, or exaction of any kind imposed by state law is either a tax or an exempt charge.*

*(b)(1)* ~~(a)~~ Any change in state ~~statute~~ *law* which results in any taxpayer paying a *new or* higher tax must be imposed by an act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, *and submitted to the electorate and approved by a majority vote,* except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property, may be imposed. *Each Act shall include:*

*(A) A specific duration of time that the tax will be imposed and an estimate of the annual amount expected to be derived from the tax.*

*(B) A specific and legally binding and enforceable limitation on how the revenue from the tax can be spent. If the revenue from the tax can be spent for unrestricted general revenue purposes, then a statement that the tax revenue can be spent for "unrestricted general revenue purposes" shall be included in a separate, stand-alone section. Any proposed change to the use of the revenue from the tax shall be adopted by a separate act that is passed by not less than two-thirds of all members elected to each of the two houses of the Legislature and submitted to the electorate and approved by a majority vote.*

*(2) The title and summary and ballot label or question required for a measure pursuant to the Elections Code shall, for each measure providing for the imposition of a tax, including a measure proposed by an elector pursuant to Article II, include:*

*(A) The type and amount or rate of the tax;*

*(B)  The duration of the tax; and*

*(C)  The use of the revenue derived from the tax.*

*(c)  Any change in state law which results in any taxpayer paying a new or higher exempt charge must be imposed by an act passed by each of the two houses of the Legislature.  Each act shall specify the type of exempt charge as provided in subdivision (e), and the amount or rate of the exempt charge to be imposed.*

*(d)* ~~(b)~~ As used in this section *and in Section 9 of Article II*, "tax" means *every* ~~any~~ levy, charge, or exaction of any kind imposed by ~~the State~~ *state law that is not an exempt charge.* ~~except the following:~~

*(e)  As used in this section, "exempt charge" means only the following:*

~~(1)  a charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the State of conferring the benefit or granting the privilege to the payor.~~

*(1)* ~~(2)~~   A *reasonable* charge ~~imposed~~ for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the ~~reasonable~~ *actual* costs to the State of providing the service or product to the payor.

*(2)* ~~(3)~~   A charge ~~imposed~~ for the reasonable regulatory costs to the State incident to issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof.

*(3) A levy, charge, or exaction collected from local units of government, health care providers or health care service plans that is primarily used by the State of California for the purposes of increasing reimbursement rates or payments under the Medi-Cal program, and the revenues of which are primarily used to finance the non-federal portion of Medi-Cal medical assistance expenditures.*

(4) A *reasonable* charge ~~imposed~~ for entrance to or use of state property, or the purchase, rental, or lease of state property, except charges governed by Section 15 of Article XI.

(5) A fine~~,~~ *or* penalty, ~~or other monetary charge~~ *including any applicable interest for nonpayment thereof,* imposed by the judicial branch of government or ~~the State, as a result of~~ *a state administrative enforcement agency pursuant to adjudicatory due process, to punish* a violation of law.

*(6) A levy, charge, assessment, or exaction collected for the promotion of California tourism pursuant to* Chapter 1 (commencing with Section 13995) of Part 4.7 of Division 3 of Title 2 of the Government Code.

*(f)* ~~(e)~~ Any tax <u>or exempt charge</u> adopted after January 1, *2022* ~~2010~~, but prior to the effective date of this act, that was not adopted in compliance with the requirements of this section is void 12 months after the effective date of this act unless the tax <u>or exempt charge</u> is reenacted ~~by the Legislature and signed into law by the Governor~~ in compliance with the requirements of this section.

*(g)(1)* ~~(d)~~ The State bears the burden of proving by ~~a preponderance of the~~ *clear and convincing* evidence that a levy, charge, or other exaction is *an exempt charge and* not a tax. *The State bears the burden of proving by clear and convincing*

*evidence that the amount of the exempt charge is reasonable and that the amount charged does not exceed the actual cost of providing the service or product to the payor.* ~~, that the amount is no more than necessary to cover the reasonable costs of the governmental activity and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity.~~

*(2)  The retention of revenue by, or the payment to, a non-governmental entity of a levy, charge, or exaction of any kind imposed by state law, shall not be a factor in determining whether the levy, charge, or exaction is a tax or exempt charge.*

*(3)  The characterization of a levy, charge, or exaction of any kind as being voluntary, or paid in exchange for a benefit, privilege, allowance, authorization, or asset, shall not be a factor in determining whether the levy, charge, or exaction is a tax or an exempt charge.*

*(4)  The use of revenue derived from the levy, charge or exaction shall be a factor in determining whether the levy, charge, or exaction is a tax or exempt charge.*

*(h)  As used in this section:*

*(1)  "Actual cost" of providing a service or product means: (i) the minimum amount necessary to reimburse the government for the cost of providing the service or product to the payor, and (ii) where the amount charged is not used by the government for any purpose other than reimbursing that cost.  In computing "actual cost" the maximum amount that may be imposed is the actual cost less all other sources of revenue including, but not limited to taxes, other exempt charges, grants, and state or federal funds received to provide such service or product.*

*(2) "Extend" includes, but is not limited to, doing any of the following with respect to a tax or exempt charge: lengthening its duration, delaying or eliminating its expiration, expanding its application to a new territory or class of payor, or expanding the base to which its rate is applied.*

*(3) "Impose" means adopt, enact, reenact, create, establish, collect, increase or extend.*

*(4) "State law" includes, but is not limited to, any state statute, state regulation, state executive order, state resolution, state ruling, state opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by the legislative or executive branches of state government. "State law" does not include actions taken by the Regents of the University of California, Trustees of the California State University, or the Board of Governors of the California Community Colleges.*

**Section 5. Section 1 of Article XIII C of the California Constitution is amended, to read:**

Sec. 1. Definitions. As used in this article:

*(a) "Actual cost" of providing a service or product means: (i) the minimum amount necessary to reimburse the government for the cost of providing the service or product to the payor, and (ii) where the amount charged is not used by the government for any purpose other than reimbursing that cost. In computing "actual cost" the maximum amount that may be imposed is the actual cost less all other sources of revenue including, but not limited to taxes, other exempt charges, grants, and state or federal funds received to provide such service or product.*

*(b) "Extend" includes, but is not limited to, doing any of the following with respect to a tax, exempt charge, or Article XIII*

*D assessment, fee, or charge: lengthening its duration, delaying or eliminating its expiration, expanding its application to a new territory or class of payor, or expanding the base to which its rate is applied.*

*(c)* ~~(a)~~ "General tax" means any tax imposed for general governmental purposes.

*(d) "Impose" means adopt, enact, reenact, create, establish, collect, increase, or extend.*

*(e)* ~~(b)~~ "Local government" means any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity*, or an elector pursuant to Article II or the initiative power provided by a charter or statute.*

*(f) "Local law" includes, but is not limited to, any ordinance, resolution, regulation, ruling, opinion letter, or other legal authority or interpretation adopted, enacted, enforced, issued, or implemented by a local government.*

*(g)* ~~(c)~~ "Special district" means an agency of the State, formed pursuant to general law or a special act, for the local performance of governmental or proprietary functions with limited geographic boundaries including, but not limited to, school districts and redevelopment agencies.

*(h)* ~~(d)~~ "Special tax" means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund.

*(i)* ~~(e)~~ As used in this article, *and in Section 9 of Article II,* "tax" means *every* ~~any~~ levy, charge, or exaction of any kind, imposed by a local ~~government~~ *law that is not an exempt charge.*~~, except the following~~:

*(j) As used in this section, "exempt charge" means only the following:*

(1) A charge imposed for a specific benefit conferred or privilege granted directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of conferring the benefit or granting the privilege.

*(1)* (2) A *reasonable* charge ~~imposed~~ for a specific *local* government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the ~~reasonable~~ *actual* costs to the local government of providing the service or product.

*(2)* (3) A charge ~~imposed~~ for the reasonable regulatory costs to a local government for issuing licenses and permits, performing investigations, inspections, and audits, enforcing agricultural marketing orders, and the administrative enforcement and adjudication thereof.

*(3)* (4) A *reasonable* charge ~~imposed~~ for entrance to or use of local government property, or the purchase, rental, or lease of local government property.

*(4)* (5) A fine~~,~~ *or* penalty, ~~or other monetary charge~~ *including any applicable interest for nonpayment thereof,* imposed by the judicial branch of government or a local government *administrative enforcement agency pursuant to adjudicatory due process,* ~~as a result of~~ *to punish* a violation of law.

*(5)* (6) A charge imposed as a condition of property development. *No levy, charge, or exaction regulating or related to vehicle miles traveled may be imposed as a condition of property development or occupancy.*

*(6)* (7)  *An* Assessments and property related fees *assessment, fee, or charge* imposed in accordance with the provisions of *subject to* Article XIII D*, or an assessment imposed upon a business in a tourism marketing district, a parking and business improvement area, or a property and business improvement district.*

*(7)  A charge imposed for a specific health care service provided directly to the payor and that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the health care service.  As used in this paragraph, a "health care service" means a service licensed or exempt from licensure by the state pursuant to Chapters 1, 1.3, or 2 of Division 2 of the Health and Safety Code.*

The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity.

**Section 6.  Section 2 of Article XIII C of the California Constitution is amended to read:**

Sec. 2.  Local Government Tax Limitation.  Notwithstanding any other provision of this Constitution:

(a) *Every levy, charge, or exaction of any kind imposed by local law is either a tax or an exempt charge.*  All taxes imposed by any local government shall be deemed to be either general taxes or special taxes.  Special purpose districts or agencies, including school districts, shall have no power to levy general taxes.

(b)    No local *law* ~~government~~*, whether proposed by the governing body or by an elector,* may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote.  A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved.  The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government, except in cases of emergency declared by a unanimous vote of the governing body.

(c)    ~~Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b).~~  (d)  No local *law* ~~government~~*, whether proposed by the governing body or by an elector,* may impose~~, extend, or increase~~ any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote.  A special tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved.

*(d)    The title and summary and ballot label or question required for a measure pursuant to the Elections Code shall, for each measure providing for the imposition of a tax, include:*

*(1)  The type and amount or rate of the tax;*

*(2)  the duration of the tax; and*

*(3)    The use of the revenue derived from the tax.  If the proposed tax is a general tax, the phrase "for general government*

*use" shall be required, and no advisory measure may appear on the same ballot that would indicate that the revenue from the general tax will, could, or should be used for a specific purpose.*

*(e)   Only the governing body of a local government, other than an elector pursuant to Article II or the initiative power provided by a charter or statute, shall have the authority to impose any exempt charge.  The governing body shall impose an exempt charge by an ordinance specifying the type of exempt charge as provided in Section 1(j) and the amount or rate of the exempt charge to be imposed, and passed by the governing body. This subdivision shall not apply to charges specified in paragraph (7) of subdivision (j) of section 1.*

*(f)   No amendment to a Charter which provides for the imposition, extension, or increase of a tax or exempt charge shall be submitted to or approved by the electors, nor shall any such amendment to a Charter hereafter submitted to or approved by the electors become effective for any purpose.*

*(g)   Any tax or exempt charge adopted after January 1, 2022, but prior to the effective date of this act, that was not adopted in compliance with the requirements of this section is void 12 months after the effective date of this act unless the tax or exempt charge is reenacted in compliance with the requirements of this section.*

*(h)(1) The local government bears the burden of proving by clear and convincing evidence that a levy, charge or exaction is an exempt charge and not a tax.  The local government bears the burden of proving by clear and convincing evidence that the amount of the exempt charge is reasonable and that the amount charged does not exceed the actual cost of providing the service or product to the payor.*

*(2)   The retention of revenue by, or the payment to, a non-governmental entity of a levy, charge, or exaction of any kind imposed by a local law, shall not be a factor in determining whether the levy, charge, or exaction is a tax or exempt charge.*

*(3)   The characterization of a levy, charge, or exaction of any kind imposed by a local law as being paid in exchange for a benefit, privilege, allowance, authorization, or asset, shall not be factors in determining whether the levy, charge, or exaction is a tax or an exempt charge.*

*(4)   The use of revenue derived from the levy, charge or exaction shall be a factor in determining whether the levy, charge, or exaction is a tax or exempt charge.*

**Section   7.   Section 3  of  Article XIII  D  of  the California Constitution is amended, to read:**

Sec. 3.   Property Taxes, Assessments, Fees and Charges Limited

(a)   No tax, assessment, fee, ~~or~~ charge*, or surcharge, including a surcharge based on the value of property,* shall be assessed ~~by any agency~~ upon any parcel of property or upon any person as an incident of property ownership except:

(1)   The ad valorem property tax ~~imposed pursuant to~~ *described in Section 1(a) of Article* XIII  and Section *1(a) of Article XIII A, and described and enacted pursuant to the voter approval requirement in Section 1(b) of Article* XIII A.

(2)   Any special *non-ad valorem* tax receiving a two-thirds vote *of qualified electors* pursuant to Section 4 of Article XIII A*, or after receiving a two-thirds vote of those authorized to vote in a community facilities district by the Legislature pursuant to statute as it existed on December 31, 2021.*

(3)  Assessments as provided by this article.

(4)  Fees or charges for property related services as provided by this article.

(b)  For purposes of this article, fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership.

**Section 8.  Sections 1 and 14 of Article XIII are amended to read:**

Sec. 1 Unless otherwise provided by this Constitution or the laws of the United States:

(a)  All property is taxable and shall be assessed at the same percentage of fair market value.  When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value.  The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value.

(b)  All property so assessed shall be taxed in proportion to its full value.

*(c)  All proceeds from the taxation of property shall be apportioned according to law to the districts within the counties.*

Sec. 14.  All property taxed by *state or* local government shall be assessed in the county, city, and district in which it is situated.  *Notwithstanding any other provision of law, such state or local property taxes shall be apportioned according to law to the districts within the counties.*

**Section 9.  General Provisions**

A.    This Act shall be liberally construed in order to effectuate its purposes.

B.    (1)   In the event that this initiative measure and another initiative measure or measures relating to state or local requirements for the imposition, adoption, creation, or establishment of taxes, charges, and other revenue measures shall appear on the same statewide election ballot, the other initiative measure or measures shall be deemed to be in conflict with this measure.   In the event that this initiative measure receives a greater number of affirmative votes, the provisions of this measure shall prevail in their entirety, and the provisions of the other initiative measure or measures shall be null and void.

(2)   In furtherance of this provision, the voters hereby declare that this measure conflicts with the provisions of the "Housing Affordability and Tax Cut Act of 2022" and "The Tax Cut and Housing Affordability Act," both of which would impose a new state property tax (called a "surcharge") on certain real property, and where the revenue derived from the tax is provided to the State, rather than retained in the county in which the property is situated and for the use of the county and cities and districts within the county, in direct violation of the provisions of this initiative.

(3)  If this initiative measure is approved by the voters, but superseded in whole or in part by any other conflicting initiative measure approved by the voters at the same election, and such conflicting initiative is later held invalid, this measure shall be self-executing and given full force and effect.

C.  The provisions of this Act are severable.  If any portion, section, subdivision, paragraph, clause, sentence, phrase, word, or application of this Act is for any reason held to be invalid by a decision of any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this Act. The People of the State of California hereby declare that they would have adopted this Act and each and every portion, section, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any portion of this Act or application thereof would be subsequently declared invalid.

D.   If this Act is approved by the voters of the State of California and thereafter subjected to a legal challenge alleging a violation of state or federal law, and both the Governor and Attorney General refuse to defend this Act, then the following actions shall be taken:

(1)  Notwithstanding anything to the contrary contained in Chapter 6 of Part 2 of Division 3 of Title 2 of the Government Code or any other law, the Attorney General shall appoint independent counsel to faithfully and vigorously defend this Act on behalf of the State of California.

(2)  Before appointing or thereafter substituting independent counsel, the Attorney General shall exercise due diligence in determining the qualifications of independent counsel and shall obtain written affirmation from independent counsel that independent counsel will faithfully and vigorously defend this Act.  The written affirmation shall be made publicly available upon request.

(3)  A continuous appropriation is hereby made from the General Fund to the Controller, without regard to fiscal years,

in an amount necessary to cover the costs of retaining independent counsel to faithfully and vigorously defend this Act on behalf of the State of California.

(4) Nothing in this section shall prohibit the proponents of this Act, or a bona fide taxpayers association, from intervening to defend this Act.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Legislature of the State of California v. Weber

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal**
**Original Proceeding** XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S281977
**Date Filed:**  June 20, 2024

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Olson Remcho, Robin B. Johansen, Margaret R. Prinzing, Richard R. Rios and Inez Kaminski for Petitioners.

Independent California Institute and Coyote Codornices Marin as Amicus Curiae on behalf of Petitioners.

Mastagni Holstedt and Kathleen N. Mastagni Storm for California Professional Firefighters as Amicus Curiae on behalf of Petitioners.

Neil K. Sawhney, Shilpi Agarwal; Catherine Rogers and Victor Leung for the ACLU Foundation of Northern California and the ACLU Foundation for Southern California as Amici Curiae on behalf of Petitioners.

Altshuler Berzon, Scott A. Kronland, Stacey M. Leyton and Matthew J. Murray for the Service Employees International Union California State Council as Amicus Curiae on behalf of Petitioners.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Matthew C. Slentz for Association of California Water Agencies, California Special Districts Association, California State Association of Counties, California Air Pollution Control Officers Association, California Association of Sanitation Agencies, California Fire Chiefs Association, California Municipal Utilities Association, City and County of San Francisco, City of Los Angeles, Fire Districts Association of California and League of California Cities as Amici Curiae on behalf of Petitioners.

Kaufman Legal Group, Stephen J. Kaufman, Gary S. Winuk and George M. Yin for California Budget and Policy Center as Amicus Curiae on behalf of Petitioners.

Sharon Terman, Katherine Wutchiett and Shazzy Kamali for California Labor Federation, California Pan-Ethnic Health Network, California Rural Legal Assistance, Inc., California Work & Family Coalition, Center For Workers' Rights, Center For WorkLife Law, Child Care Law Center, Disability Rights Education & Defense Fund, Equal Rights Advocates, First 5 California, Legal Aid at Work and Unite-LA as Amici Curiae on behalf of Petitioners.

Covington & Burling, David B. Goodwin, Serena R. Saffarini, Natalie R. Maas and Stanley Young for Edmund G. Brown, Jr., as Amicus Curiae on behalf of Petitioners.

Strumwasser & Woocher, Michael J. Strumwasser, Beverly Grossman Palmer, Dale K. Larson and Salvador E. Pérez for Michael Cohen, B. Timothy Gage and Ana Matosantos as Amici Curiae on behalf of Petitioners.

Messing Adam & Jasmine, Gary M. Messing, Gregg McLean Adam, Jason H. Jasmine and Matthew Taylor for Operating Engineers Local 3, California Statewide Law Enforcement Association, San Jose Police Officers' Association, Superior Court Professional Employees' Association, Davis Professional Firefighters' Association, Local 3494, East Palo Alto Police Officers' Association and Sacramento Housing & Redevelopment Agency Employees Association as Amici Curiae on behalf of Petitioners.

Greines, Martin, Stein & Richland, Robin Meadow, Katarina E. Rusinas; Public Counsel, Gregory Bonett, Jonathan Jager and Faizah

Malik for 45 Members of the United to House LA Coalition as Amici Curiae on behalf of Petitioners.

Lozano Smith, Sloan R. Simmons, Daniel M. Maruccia, Constantine C. Baranoff; Keith J. Bray, Kristin D. Lindgren and Dana Scott for California School Boards Association's Education Legal Alliance as Amicus Curiae on behalf of Petitioners.

Steven J. Reyes, Mary M. Mooney and Alexa P. Howard for Respondent.

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk, Paul Gough; Howard Jarvis Taxpayers Association, Jonathan Coupal, Timothy Bittle and Laura Dougherty for Real Party in Interest.

Jack Cohen as Amicus Curiae on behalf of Respondent and Real Party in Interest.

Turner Law and Wm. Gregory Turner for California Farm Bureau Federation, James Gallagher, Joe Coto and Don Perata as Amici Curiae on behalf of Respondent and Real Party in Interest.

Law Offices of Jason A. Bezis and Jason A. Bezis for Alameda County Taxpayers' Association, California Taxpayer Protection Committee, Central Valley Taxpayers Association, Chico Taxpayers Association, Coalition of Sensible Taxpayers (Marin County), Gold Country Taxpayers Association, Los Angeles County Taxpayers Association, Orange County Taxpayers Association, Placer County Taxpayers Association, Reform California, Sacramento County Taxpayers Association, San Francisco Taxpayers Association, Silicon Valley Taxpayers' Association, Solano County Taxpayers Association, Sutter Yuba Taxpayers Association, Ventura County Taxpayers Association, the Red Brennan Group and Moving Oxnard Forward as Amici Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Margaret R. Prinzing
Olson Remcho, LLP
1901 Harrison Street, Suite 1550
Oakland, CA 94612
(510) 346-6200

Thomas W. Hiltachk
Bell, McAndrews & Hiltachk, LLP
455 Capitol Mall, Suite 600
Sacramento, CA 95814
(916) 442-7757